**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                                              |     |                            |
| -------------------------------------------- | --- | -------------------------- |
|                                              | *   |                            |
| **HELENE CLARKE,**                           | *   |                            |
| **Plaintiff**                                | *   |                            |
| **v.**                                       | *   | **CIVIL No. 1:10-cv-3107-JKB** |
| **UNUM LIFE INSURANCE COMPANY,**             | *   |                            |
| **OF AMERICA,** *et al.*,                    |     |                            |
|                                              | *   |                            |
| **Defendants**                               |     |                            |
|                                              | *   |                            |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM**

**In Re**    **Defendants' Motion for Summary Judgment (ECF No. 51);**
**Plaintiff's Motion for Summary Judgment (ECF No. 52)**

Helene Clarke ("Plaintiff") brought this suit against Unum Life Insurance Company of America and the Pearson, Inc. Employee Long Term Disability Plan ("Defendants") seeking reinstatement of long-term disability benefits, payment of back-benefits, and court costs pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), and the imposition of administrative penalties pursuant to 29 C.F.R. § 2560.502-1(g) *et seq.*  Now pending before the Court are Defendants' Motion for Summary Judgment (ECF No. 51) and Plaintiff's Cross-motion for summary judgment (ECF No. 52).[1]  The issues have been briefed and no oral argument is required.[2]  Local Rule 105.6.  For the reasons explained below, Defendants' Motion for Summary Judgment (ECF No. 51) is GRANTED IN PART (with respect to administrative penalties) and DENIED IN PART (with respect to Plaintiff's claim for

---

[1] ECF Document No. 52 is styled as "Plaintiff's Opposition to Defendants' Motion for Summary Judgment." However, both sides have treated the document as a motion for summary judgment in its own right, as well as a response to Defendants' motion.  The Court will do the same.
[2] Requests for oral argument are therefore denied.

benefits) and Plaintiff's Cross-motion for Summary Judgment (ECF No. 52) is GRANTED IN PART (with respect to her claim for benefits) and DENIED IN PART (with respect to administrative penalties).

## I.   BACKGROUND

Plaintiff was formerly employed by Pearson, Inc. where she worked as a Strategic Account Executive, selling teacher training materials to school districts in Maryland, Virginia, Pennsylvania, and the District of Columbia.  As a Pearson employee, Plaintiff was eligible for coverage under Pearson's Long Term Disability Plan ("the Plan"), which is insured and administered by Defendant Unum Life Insurance Company.

During her employment with Pearson, Plaintiff was involved in two car accidents.  The first occurred on February 21, 2006, when Plaintiff was sideswiped by an 18 wheel tractor trailer on her way to meet with clients in Washington, D.C.  She subsequently began to experience pain, stiffness, numbness, and tingling in her neck, shoulders, and hands.  (Dr. Pribadi Consultation Report, FU-CL-LTD-000367 – SEALED).  The second accident occurred about two years later, on January 24, 2008, when Plaintiff's car was struck by another car as she was leaving a client school in Prince George's County.  *Id.*

About eight months after the second accident, on August 26, 2008, Plaintiff filed a claim for long-term disability ("LTD") benefits with Unum, citing disc displacement and osteopenia of the lumbar spine.  On November 11, 2008, Unum notified Plaintiff by letter that her claim had been approved.  (FU-CL-LTD-000768 – SEALED).  The letter advised Plaintiff, however, that she was required to continue to meet the Plan's definition of disability in order to receive continuing benefits, and that UNUM would periodically request medical and vocational documentation to establish her continuing eligibility.

Unum began paying benefits on September 14, 2008, but it continued to evaluate Plaintiff's claim.  First, Unum referred Plaintiff's file to its Senior Vocational Rehabilitation Consultant, Norma Parras-Potenzo, for an occupational assessment.   Ms. Parras-Potenzo consulted the Enhanced Dictionary of Occupational Titles ("DOT") and determined that Plaintiff's occupation was most consistent with the title of Sales Representative (Semi-Technical Products).  The DOT indicated that the exertional demands of that occupation were as follows: "lifting, carrying, pushing, pulling 20 lbs. occasionally, frequently up to 10 lbs. or negligible amount constantly"; "frequent reaching, handling, fingering, talking, hearing, near acuity"; "occasional stooping, keyboard use, far acuity"; and "frequent periods of sitting, occasional standing and walking during the workday."  (Parras-Potenzo Review I, FU-CL-LTD-000440-442 – SEALED).  Ms. Parras-Potenzo also later determined that "[d]riving would be a material duty of this occupation, the claimant would need to drive to meet with clients/accounts assigned and sell products/services."   (Parras-Potenzo Occupational Review II, FU-CL-LTD-000533 – SEALED).

A few weeks later, on October 6, 2008, Unum sent Senior Field Representative Paul Weiss, ALHC, to interview Plaintiff at her home.  (Weiss Field Report, FU-CL-LTD-000631-639 – SEALED).  Mr. Weiss spoke with Plaintiff for about 95 minutes on various topics, including her condition and daily activities.  He noted that she did not appear to him to be in any physical distress or to be suffering from any cognitive difficulties.  On the contrary, he observed that she appeared "animated," that her answers were "on point and thorough," and that she maintained her own claim file at home, which to him evinced a "well-organized person."  *Id.*

A few weeks later, on October 21, 2008, Unum's on-site physician, Matthew Hine, M.D.,

Ph.D., conducted a review of Plaintiff's claim file.   (Hine Review I, FU-CL-LTD-000685-696–

SEALED).   At that point, the file contained, in pertinent part, the following:

> Brief Summary / History of File: SYNOPSIS: EE is a 54 YO female account executive oow since 3-17-08 with dx of disc displacement and osteopenia of lumbar spine.
>
>   -Wong
> APS dx of chronic pain.   R&L's [sic] sit 4 stand 4 and walk 4.   lift up to 20 lbs occasionally.   RTW TBD.   EFAF gives 6 hrs sed 2 hours light.   Wonge [sic] ovns [sic] note abnormal glucose, abdominal pain, fatigue, HTN.   Wong notes on APS that on 3-17-08 she did not advise the EE to stop work
>
> -Hughes RTW release dated 8-5-08 with R&L of no lifting over 55 lbs.
>
> -EMG 9-4-08 was normal
>
> -Neuro exam 8-26-08 was normal
>
> -CT 7-11-08 notes mild dengenrative [sic] disc bulging and spondyloarthropathy. c4-c5 mild central canal stenosis with ventral cord impingement.
>
> -MRI 4-14-08 notes herniated disc at c3 and c4, c4-c5 disc bulge at c5-c6.
>
> -x-ray 4-28-08 notes osteopenia of the lumbar spine.
> …
>
> R & L as stated by AP(s): May perform full time activity at the LIGHT level as of September 2008, (per 10/21/08 OSP phone call to AP Dr. Wong, Family practice).
>
> …
>
> Diagnoses have included:
>
> Status-post cervical sprain due to work related motor vehicle accident, 2006[;] Cervical Radiculopathy[;] Degenerative disc disease, cervical spine[;] Symptoms of carpal tunnel syndrome[;] Status-post bunionectomy, osteotomy left first metatarsal (2006)[;] Capsulitis, left midfoot (2007), improved with orthotics[;] Hyperplastic rectal polyp (2008)[;] Osteopenia, lumbar spine[;] "Possible fibromyalgia"[;] "Possible post-traumatic stress"[;] History of depression and hypertension[;] History of agoraphobia (per Dr. Pribadi's March 2008 note)[;] Hypertension[.]

… physical therapy notes of May 2006-January 2007, notes of orthopedists Dr. Hughes, Dr. Bernstein and Dr. Haque, neurologist Dr. Avin and PCP Dr. Wong.

The claimant stopped working in March 2008 because of complaints of increased pain. She submitted a report to Unum on September 17, 2008, stating, "I have been on medical Worker's Compensation leave since March 17, 2008." She stated that the specific job duties that she could not perform were: Typing more than 15 minutes consecutively[;] Lifting more than 15 pounds[;] driving more than two hours per day[.]

… Notes of a telephone call between the DBS and the claimant comment: "She states that she can do grocery shopping but does not lift heavy objects. She does use a vacuum but it does hurt. She does pull weeds from her garden, but no longer sews or crochet's [sic]. She can drive for 40 minutes maximum. She stated that by February 2008 she was exhausted from her job, and on March 17, 2008 decided that she was in too much pain to work, and she went to her doctor who told her to stop working."

A March 2006 nerve conduction velocity study of the bilateral upper extremities was normal for median and ulnar nerves, but could not comment on radiculopathy of C5, C6 or C7.

According to an orthopedic visit with Dr. Hughes of June 28, 2008, on physical exam Lhermitte's sign was positive with right arm radiculopathy. There were complaints of paresthesias and pain up and down the arm on the dorsal-radial aspect, and paresthesias in the median three fingers as well. Phalen's and Tinel's signs were mildly positive. Dr. Hughes injected the right carpal tunnel with a steroid. He noted that this would not be helpful regarding the symptoms of cervical radiculopathy.

In March 2008, examination by Dr. Bernstein noted cervical paravertebral muscle spasm, and he assessed cervical radiculopathy versus carpal tunnel syndrome.

When seen by family practice physician Dr. Pribadi in March 2008, she complained of trapezius and cervical pain. He provided trigger point injections.

When seen by orthopedist Dr. Haque in April 2008, the claimant gave the following history: The patient's problems began after a work-related car accident on February 21, 2006. The patient was sideswiped by an 18-wheeler on the drivers [sic] side of her car. She was sent to Holy Cross Hospital and evaluated, but states no x-rays were taken. She saw complained [sic] of upper extremity pain and tingling, and was told she had carpal tunnel syndrome, and started on therapy. She had only mild improvement and was told she needed surgery for this initially. A second opinion with Dr. Barth, who recommended an injection first [sic] She had this done but had no improvement. An EMG and nerve conduction

study was apparently negative for carpal or cubital tunnel syndrome.  She has persistent pain with a stiff neck, a stiff right shoulder, a cold sensation and numbness and tingling in both hands, worse on the right.  The pain is rated 10/10 on the right and less on the left.  The patient's symptoms are improved with decreased driving and typing.  Naprosyn helps somewhat as does moist heat.  She cannot hold a soda can.  In March she had markedly worsened symptoms. Examination of the cervical spine founded [sic] decreased range of motion and significant paraspinous muscle and trapezius tenderness.  Strength, sensation and reflexes in the upper extremities were normal.  There was a positive Spurling's test (cervical forminal narrowing), and negative Lhermitee's [sic] sign (cervical dural irratation [sic]).  Tinel's test was negative, Phalen's test was mildly positive (carpal tunnel irritation).   His assessment was cervical radiculopathy with minimal carpal tunnel findings.

When seen by orthopedist Dr. Hughes on 5/14/08, Ms. Clarke complained of pain of the neck, arms, hands, back, legs, toes, and right greater than left shoulder pain. She rated the pain 7/10, and stated symptoms had worsened since the motor vehicle accident of 2006.  Dr. Hughes noted "She has been out of work since March 17, 2008.  She was on light duty from February 21, 2006-February 27, 2006."   Orthopedic examination was within normal limits, other than mild palpatory tenderness of the cervical spine, with decreased range of motion and positive right Spurling's test Thoraco-Lumbar spine was without palpatory tenderness and had full active range of motion.  His assessment was neck sprain (resolved), and cervical degenerative disk [sic] disease, rule out facet fracture.  He prescribed a three-phase bone scan of the cervical spine, but the records do not indicate this was performed.   (However, subsequent cervical CT showed no fracture)[.]   He advised a work release of no lifting over 30 pounds, and no driving over one hour at a time.
CT of the neck July 2008 indicated mild multi-level degenerative disc bulging and spondyloarthropathy[.]   These were most pronounced at C4-5 with very mild central stenosis with ventral cord impingement worse on the left side.  There was no focal disc herniation and no evidence of fracture within the cervical spine.

The claimant was evaluated by neurologist Dr. Avin in August 2008.  A 9/4/08 EMG nerve conduction velocity study of the right upper and right lower extremities was normal.  The claimant was seen again by Dr. Avin on 9/29/08. Exam was essentially normal.  He reviewed cervical MRI of 2006 and 2008 "both of which demonstrate degenerative changes at C4-5 and C5-6.  Dr. Avins [sic] commented, "The patient does well unless she travels long distances or carries equipment."

A 9/16/08 note, apparently from Dr. Wong, indicates follow up for chronic pain. It states "sees neuro and psych" for this condition.  However, the records do not include records from either a psychologist or psychiatrist.

In a field visit report dated October 10, 2008, the claimant was not exhibiting any difficulty in terms of standing, sitting, handling or cognitive function. The claimant had concerns regarding a "hostile work environment" with the prior employer.

At the time of the field visit, medications included: Benicar (hypertension) Naproxen (anti-inflammatory) Cyclobenzaprine (muscle relaxant)

There is no indication of adverse medication side effects.

*Id.* at 000687-694.

Dr. Hine stated that in his opinion the test results and diagnoses in Plaintiff's file would not be expected to result in significant functional impairment. He concluded that "within a reasonable degree of medical certainty," Plaintiff had the capacity to perform full-time light exertional work as of March of 2008. On the same day, Dr. Hine spoke with Dr. Wong, Plaintiff's treating physician, who stated that she concurred that Plaintiff was capable of full-time work at the light exertional level. *Id*. at 000685.

Shortly thereafter, Unum received an Attending Physician Statement from Dr. Clifford Hinkes, M.D. (Hinkes APS, FU-CL-LTD-000698-000701 – SEALED). In the report, Dr. Hinkes diagnosed Plaintiff with carpal tunnel syndrome, cervical spondyliosis, and radiculopathy. He opined that she could return to work full-time (performing physical tasks consistent with the "light" demand category). However, in sections of the APS form marked "RESTRICTIONS" and "LIMITATIONS", Dr. Hinkes wrote "limited driving, lifting, etc." *Id*. at 000699.

When Unum received Dr. Hinkes' report, they forwarded it to Dr. Hine for his review. (Hine Review II, FU-CL-LTD-000730-732 – SEALED). Dr. Hine noted that Dr. Hinkes' only limitation was "limited, driving, lifting, etc." and commented that it was "somewhat vague." *Id*. at 000732. He then stated that he assumed Plaintiff's occupation only involved driving up to one

third of an eight-hour work day, in which case he did not "see an activity restriction from an AP that precludes regular duty." *Id*.

A few days later, on October 30, 2008, Ms. Parras-Potenzo contacted Plaintiff's employer to gather more information about the amount of traveling involved in her occupation.  She concluded that Plaintiff would be traveling up to 70% of the time, sometimes driving for up to half of a work day, and that work days could be longer than eight hours.  (Parras-Potenzo Review II, FU-CL-LTD-000733-34 – SEALED).

Unum forwarded Ms. Parras-Potenzo's findings to Dr. Hine.  He responded that he could not state with any medical certainty that Plaintiff could perform the requisite amount of driving. He opined that she would likely complain of significant symptoms after driving continuously for even two hours, and that it was more realistic to expect that she could drive for 30 to 60 minutes at a time.  He also noted, however, that she might be able to drive for a total of up to four hours per day if it were broken into 30 to 60 minute segments.  He therefore requested further information regarding the number of days per week that Plaintiff would have to drive, and whether the driving would be continuous.  (Hine Review III, FU-CL-LTD-000735-737 – SEALED).

On November 3, 2008, Ms. Parras-Potenzo conducted further research on the travel demands of Plaintiff's occupation and reported that, when working in Washington, D.C., Plaintiff would drive only intermittently throughout the day, but that she would drive for up to two hours continuously one way when visiting clients elsewhere in Maryland, and six to eight hours when traveling to Pennsylvania or Virginia, plus travel time between different clients in those states.  (Parras-Potenzo Review III, FU-CL-LTD-000739 – SEALED).

When this information was forwarded to Dr. Hine, he responded that he was "unable to state with reasonable medical certainty" that Plaintiff could drive six to eight hours per day. (Dr. Hine Review IV, FU-CL-LTD-000738 – SEALED).

Later in November of 2008, Ms. Parras-Potenzo raised the possibility of providing Plaintiff with "return-to-work services" and "vocational assistance," suggesting that Plaintiff's sales experience might make her employable in another occupation. She indicated that she planned to speak with Plaintiff regarding her carpal tunnel syndrome and determine how it affected her keyboarding abilities. (Parras-Potenzo Notes, FU-CL-LTD-000801 – SEALED). On December 1, 2008, Ms. Parras-Potenzo spoke with Plaintiff about return-to-work services. Her notes of the conversation read, in pertinent part, as follows:

> [Plaintiff] stated that she wants to RTW [return to work] in another job, however, since her accident in 2006, she has never had the opportunity to get the physical therapy that she knew would help her. [Plaintiff] reports the constant travel of her job since that day exacerbated her pain and symptoms and when she stopped working, she has remained at a point where she has pain when sitting at a computer for more than 15 minutes and her hand and forearm have pain and her middle 3 fingers in both hands feel numb/tingle. [Plaintiff] stated that she does not know if she has CTS [carpal tunnel syndrome] or not because some doctors have told her she has CTS, other orthopedic surgeons have told her she does not have CTS. [Plaintiff] had cortisone injections previously, but these injections did not help.
>
> [Ms. Parras-Potenzo] and [Plaintiff] discussed what is needed for [Plaintiff] to RTW in an alternate occupation, and [Plaintiff] agreed that she needs to have her hands/neck taken care of.

(Parras-Potenzo Notes, FU-CL-LTD-000809 – SEALED). Ms. Parras-Potenzo and Plaintiff agreed to follow up on their discussion in three months to assess whether Plaintiff had made enough progress that she could begin RTW services.

About six weeks later, on January 12, 2009, another Unum representative, Micah Kilton, called Plaintiff for a telephone interview in which he asked her a number of questions about her

condition, treatment regimen, recovery, daily activities, and prospects for returning to work. Plaintiff reported to Mr. Kilton that her condition had worsened and that she was now experiencing a pain level of 7.9/10. She stated that the pain and her stiff neck were preventing her from returning to her former job, but that she hoped to be able to find a different occupation. She also stated that she had begun physical therapy and that she attended twice a week, but that she did not know how long treatment would take to be effective. (Kilton Notes, FU-CL-LTD-000816-817 – SEALED).

About a month later, on February 17, 2009, Ms. Parras-Potenzo contacted Plaintiff to follow up on their discussion about return-to-work. Ms. Parras-Potenzo inquired whether Plaintiff had noticed any improvement in her condition. Plaintiff responded that she was still in considerable pain, which she described as 8/10, but that it was better than when she was driving for several hours a day and doing computer work. Ms. Parras-Potenzo suggested that Plaintiff try using ergonomic devices to allow her to do computer work more comfortably. She stated she would send Plaintiff an ergonomic catalog and follow up in two to three weeks. (Parras-Potenzo Notes, FU-CL-LTD-000931-932 – SEALED).

The following day, Dr. Wong submitted a letter to Unum which stated: "This letter is to verify that HELENE CLARKE has physical impairments that prevent her from engaging in substantial full time gainful activity. After consultation with her physical therapist this is expected to be indefinite in duration." (Wong Letter, FU-CL-LTD-000950-951 – SEALED).

The record does not indicate what happened during the following six weeks, and it is unclear whether Plaintiff and Ms. Parras-Potenzo had any further communications regarding RTW services. But, on March 31, Unum began to conduct video surveillance on Plaintiff, which

it continued through April 2.  The video footage is not on record, and the parties disagree as to precisely what it shows.  Defendants characterize the video as follows:

> [Plaintiff] was observed walking briskly in a parking lot without any outward signs of pain or discomfort.  She was also seen bending easily at the waist and able to enter and exit a vehicle without any outward signs of pain or discomfort.  She also was seen pulling and wheeling a briefcase.  She was also observed driving (at times exceeding the speed limit) for prolonged periods of time.

(Def.s' Mem. at 30, ECF No. 51).  Plaintiff claims, however, that the activity recorded in the video surveillance is actually quite minimal and that it does not support Defendants' characterizations.  Specifically, Plaintiff describes the content of the footage as follows:

| Date | Time | Activity |
|------|------|----------|
| 3/31/09 | 6 AM – 12 PM | No activity |
| 4/1/09 | (FCE Appointment Surveillance) | |
| | 8:20 AM | Claimant walks slowly to her vehicle with rolling case Takes nearly two minutes to exit vehicle |
| | 9:25 AM | Walks in/out of PT office to put something in her car |
| | 11:36 AM | Claimant exchanges item with another woman who is also waiting outside PT office, then walks back to office |
| | 12:40 PM | Claimant goes to car with rolling case and places it into car Returns to office and back to car |
| | 1:25 PM | Returns home |
| 4/2/09 | | |
| | 12:56 PM | Claimant followed to a parking garage, no other footage |
| | 2:34 PM | Claimant returning to her home |

11

(Pl.'s Mem./Resp. at 36, ECF No. 52).

On April 1, 2009, while the surveillance was underway, Unum referred Plaintiff for a functional capacity evaluation ("FCE") to determine the extent to which her condition would affect her ability to work.  The evaluation was performed by Mylah Garlington, P.T. of the Heartland Physical Therapy Provider Network.  Based on Plaintiff's performance on a number of physical tasks, Ms. Garlington determined that Plaintiff was capable of working full-time in the "light" physical demand category.  She noted that although Plaintiff exhibited pain with certain tasks, some of which she was unable to complete, she believed Plaintiff was restricting her effort and not allowing her full capacity to be measured.  (Garlington FCE, FU-CL-LTD-001152-1159 – SEALED).

A few days later, on April 3, 2009, Unum referred Plaintiff's file to Senior Clinical Consultant Paul Burgos, M.A., A.L.H.C., for review.  Specifically, Unum requested Mr. Burgos to evaluate information submitted by Plaintiff's psychologist, Dr. Harvey Sweetbaum, and determine whether, in combination with the rest of the medical evidence on file, that information supported any "impairment in global functioning."  (Burgos Review, FU-CL-LTD-001127-1128 – SEALED).  Mr. Burgos noted that Dr. Sweetbaum had diagnosed Plaintiff with Adjustment Disorder with mixed depressive and anxiety features, and that he had indicated a GAF score of 68.  Mr. Burgos stated that this score reflected "only some mild symptoms or some difficulty in functioning but generally functioning pretty well."  *Id.*  He also noted, however, that it was unclear whether Dr. Sweetbaum was continuing to treat plaintiff or whether he was certifying a psychiatric impairment or disability.  Mr. Burgos therefore called Dr. Sweetbaum on the phone for clarification of his opinion.  Dr. Sweetbaum stated that he had not treated Plaintiff since

December 3, 2008, and declined to certify disability based on Plaintiff's mental symptoms. (Burgos Notes, FU-CL-LTD-001194-1195 – SEALED).

Several weeks later, on April 27, 2009, Plaintiff's physical therapist, Chinh Le, P.T., submitted a letter to Unum expressing his disagreement with the results of the FCE.  Among other things, he stated that plaintiff could, in fact, only sit for about an hour at a time without experiencing progressively worsening pain in her neck and arm, and that this prevented her from driving long distances.  He reported that Plaintiff's pain at that time, without work, was 6-7/10, but that he believed Plaintiff's symptoms would regress if she returned to work full-time and that her pain would return to 10/10.  He recommended instead that Plaintiff return to work part-time and gradually increase to full-time.  (Le Letter, FU-CL-LTD-001214-1214 – SEALED).

About a week later, on May 4, 2009, Unum requested an additional opinion from Ms. Garlington as to whether Plaintiff had the functional capacity to work full-time in the light physical demand category if her work days sometimes exceeded eight hours.  Ms. Garlington opined that Plaintiff could work more than eight hours a day but that she should not drive more than eight hours per day.  (Garlington FCE II, FU-CL-LTD-001238 – SEALED).

Two days later, on May 6, 2009, Unum referred Plaintiff's file to Dr. Stephen Leverett, D.O., for further medical review.  Dr. Leverett opined that Plaintiff's medical records did not indicate that she would be unable to perform the duties of her occupation, which included traveling up to two thirds of the day, constant sitting, frequent standing and walking, and occasionally lifting or carrying up to 20 pounds.  He remarked that the record suggested that Plaintiff had experienced improvement from physical therapy, even though she continued to complain of pain, and that the FCE probably measured Plaintiff's minimum functional capacity (rather than her maximum capacity) because of her self-limiting behavior.  He opined that if the

13

FCE operator [Ms. Garlington] found that Plaintiff could work for more than eight hours a day, then "it would appear no additional medical steps are indicated, as the FCE assessment was essentially one that portrayed the minimal physical functional capacity of the Insured." (FU-CL-LTD-001251-001257 – SEALED).

The same day, Dr. Leverett spoke with Dr. Wong regarding her opinion of Plaintiff's condition.  Apparently, Dr. Wong stated that she wished to defer assessment of Plaintiff's work capacity to Mr. Le.  Dr. Leverett's notes indicate that he and Dr. Wong also discussed Plaintiff's alleged inconsistency and self-limiting behavior during the FCE, the recommendations of Mr. Le, Dr. Wong's understanding of "job" versus "occupation" in the national economy, the vocational consultations between Plaintiff and Unum, and Dr. Wong's stated desire to defer disability assessment to Mr. Le.  (Leverett Notes I, FU-CL-LTD-001268-1269 – SEALED).  Dr. Leverett also contacted Mr. Le to discuss the same topics, as well as Mr. Le's disagreement with the FCE results.  (Leverett Notes II, FU-CL-LTD-001276-1277 – SEALED).  The record does not reflect what Dr. Leverett, Dr. Wong, or Mr. Le said on any of these subjects during the conversations.

Two days later, on May 8, 2009, Ms. Parras-Potenzo performed another vocational review in light of the results of the FCE.  She stated that it was reasonable to expect that although Plaintiff's occupation required extensive driving and travel, she should be able to perform her duties without having to drive more than eight hours a day.  She suggested, for instance, that Plaintiff could fly for long trips, or drive to a location and stay overnight before driving back. (Parras-Potenzo Review IV, FU-CL-LTD-001280-1281 – SEALED).

About a week later, on May 14, 2009, Unum notified Plaintiff that it was terminating her benefits because she no longer met the definition of "disabled" under the Plan.  The termination

letter stated that Unum's reasons for its decision were: (1) "the lack of clarity of the cause of [Plaintiff's] pain complaints; (2) the fact that [Plaintiff] was working for some time following the January 24, 2008 accident; (3) a personal visit to [Plaintiff's] home on October 6, 2008 by Paul Weiss, ALHC ("Mr. Weiss") wherein [Plaintiff] did not exhibit any difficulty with standing, sitting, handling or cognitive function; (4) "surveillance taken of [Plaintiff] from March 31, 2009 to April 2, 2009, wherein she was observed walking briskly, bending easily, pulling and wheeling a briefcase, and driving for prolonged periods without any outward signs of pain or discomfort"; (5) "the lack of any referral for a neurosurgical consultation"; (6) "the April 1, 2009 FCE which assessed [Plaintiff] as capable of the light exertional demand category with the ability to return to work in her occupation on a full-time basis"; (7) "the overall lack of any medical documentation to establish that [Plaintiff] was precluded from being able to work full-time"; and (8) the fact that Harvey Sweetbaum, Ph.D. ("Dr. Sweetbaum"), [Plaintiff's] treating clinical psychologist, did not treat [Plaintiff] for any mental condition since December 3, 2008, and did not certify any disability based on a mental condition.  Moreover, [Plaintiff] never sought treatment from a pain specialist."   The letter concluded that "[t]he multiple inconsistencies in your file do not support the level of pain and discomfort that you have reported."  (Termination Letter, FU-CL-LTD 001309 – SEALED).

After receiving the termination letter, Plaintiff retained counsel and, on November 6, 2009, filed an appeal.  Plaintiff's counsel submitted a letter to Unum which disputed its decision to terminate benefits and provided additional evidence of Plaintiff's disability.  The letter also included volumes of medical literature about various conditions as well as documents relating to Unum's claims handling procedures and financial status.   (FU-CL-LTD-001384-1472 – SEALED).

A number of the items Plaintiff submitted on appeal dealt specifically with her functional capacity.  First, Plaintiff submitted the results of a Standard Hand Testing Evaluation performed by Carlos Martinez, P.T.  (FU-CL-LTD-004440-4441 – SEALED).  Mr. Martinez reported the following: on the Hand Tool Dexterity Test, Plaintiff scored between the 1st and 10th percentiles, and experienced "difficulty manipulating the tools, nuts, bolts, washers and screws," and showed an "inability to work with tools and manipulate smaller work related items"; on the Purdue Pegboard Test, Plaintiff "scored below normative population averages for assembly jobs, general factory work, production work, electronic production work, female hourly production workers, maintenance and service employees and sewing machine operator [sic]"; on the Minnesota Dexterity Test, Plaintiff scored "below normative population averages"; and, Plaintiff scored below the first percentile in all tests "with regard to moving small objects various distances" and in the 0.6th percentile on the O'Connor Tweezer Dexterity Test.  Mr. Martinez concluded that Plaintiff "does not present with the ability to perform jobs or tasks that require manual dexterity," that she "can not sustain the necessary hand use requirements to perform work as required in the workplace," and that she "did not demonstrate the ability to sustain any employment due to the substantial restrictions in her hand use abilities."  *Id.*

Second, Plaintiff submitted the results of a neuropsychological evaluation by Dr. Rick Parente.  (FU-CL-LTD-004208-4224 – SEALED).  Dr. Parente's report states that he performed a battery of tests on the Plaintiff, mostly related to her cognitive abilities, but also including some emotional and physical testing.  The majority of Plaintiff's scores were in the "average range."  Dr. Parente noted, however, that Plaintiff demonstrated some difficulty with certain tasks involving concentration and memory.  He opined that Plaintiff's difficulty concentrating would prevent her from returning to her former work.

Finally, Plaintiff submitted a response from Mr. Le to a set of "interrogatories," in which he stated the following: that Plaintiff suffered from cervical radiculopathy, muscle spasms, and "weakness"; that his examinations found her to have mild weakness in her hands; that she was able to care for her personal needs "with difficulty"; that she could lift six to ten pounds on an occasional basis and five pounds regularly; that she could not complete a normal eight hour work day in a job requiring frequent hand use; and that he concurred with the opinions of Mr. Martinez and Dr. Parente.  (Le Interrogatory Answers, FU-CL-LD-002501-2507 – SEALED).

Unum referred Plaintiff's supplemental materials to several of its own consultants and physicians for review.  First, on December 10, 2009, Unum requested a review from Senior Clinical Consultant Ann Murphy, R.N., L.N.C.C.   (Murphy Review, FU-CL-LTD-002955-002964 – SEALED).   Nurse Murphy reviewed and summarized the extensive records in Plaintiff's file and concluded that "[a]ll conditions individually and in combination, including impact on functional capacity, have been considered and do not support the severity of pain and loss of function as reported by the claimant."  *Id*.  She deferred evaluation of Plaintiff's functional capacity to a doctor.

Next, Unum referred Plaintiff's file to Dr. Andrew Krouskop, M.D.  (Krouskop Review I, FU-CL-LTD 002968-2979 – SEALED).  Dr. Krouskop reviewed Plaintiff's file and concluded that she was limited to lifting about 25 to 30 pounds, but that the evidence did not support ongoing inabilities to function.  He relied largely on the fact that Plaintiff's upper extremity strength was measured as normal in most of her physical tests.  He opined that the weakness found by Mr. Le was probably a result of Plaintiff's self-limitation.  He also observed that there was no evidence of continuing adverse side effects of medications, and noted that Plaintiff had

not been placed on different kinds of pain medication or referred to a pain specialist, as would be expected for someone who complained of chronic pain.

Later, Dr. Krouskop conducted a second review to specifically address Plaintiff's contention that she was affected by a combination of physical and cognitive limitations, *i.e.*, cervical pain, carpal tunnel syndrome, medication side effects, amnestic syndrome, and adjustment disorder.   (Krouskop Review II, FU-CL-LTD 004225-004231 – SEALED).   He observed that there was a conflict between the results of Plaintiff's hand testing, which showed very low functioning, and the results of the neurorehabilitation review by Dr. Parente, in which he noted that she had no difficulty with tests of finger dexterity.   Dr. Krouskop also noted that the hand tests did not include any validity testing and opined that they were therefore entitled to little weight.   He concluded that there was nothing in Plaintiff's file that would cause him to change his original opinion.

Next, Unum forwarded Dr. Parente's neurorehabilitation report to its clinical neuropsychologist, D. Malcolm Spica, Ph.D., for review.   Dr. Spica opined that the report did not support a finding of disability based on cognitive limitations, largely because Dr. Parente did not conduct any "validity" or "personality/psychological" testing.   Dr. Spica therefore found the report to be unreliable.   He also noted, however, that even accepting the validity of the tests, Plaintiff's scores were essentially normal and did not suggest any cognitive impairment.   He also stated that he had contacted Dr. Parente to request the "raw data" from his examination and had posed a number of questions to him in writing, but had not received a response.   Finally, he asserted that his internet research revealed that Dr. Parente had a financial interest in a company called Memoryzine, whose products he recommended Plaintiff purchase as a treatment.   (FU-CL-LTD-004236-4242 – SEALED).

Dr. Parente produced a responsive letter, indicating that he in fact did send Dr. Spica the raw data from his tests. He also disagreed with Dr. Spica's criticisms. First, he opined that there were no known reliable tests of "symptom validity." Second, he explained that, in his experience, patients with cognitive dysfunction often have largely normal test scores. He further pointed out that Dr. Spica did not indicate what pattern of scores would have been required to support the diagnosis. Lastly, he asserted that he had no financial connection to Memoryzine and that his work for them was strictly on a volunteer basis. (Parente Letter, FU-CL-LTD-004400-4405 – SEALED).

After receiving Dr. Spica's review, Unum referred Dr. Parente's report to another neuropsychologist, Steven Van De Mark, Ph.D., for a second opinion. Dr. Van De Mark concurred with Dr. Spica. (Van De Mark Review, FU-CL-LTD-004269-4275 – SEALED).

On February 17, 2010, Unum issued a decision, denying Plaintiff's appeal. Unum's written opinion explained that it had concluded, largely based on the FCE and surveillance footage, that Plaintiff was not restricted from performing the duties of her occupation. It further explained that its own doctors had reviewed the opinions of Dr. Wong and Mr. Le and found that they were not supported by objective evidence. Further, it noted that Unum's reviewers found the hand tests and the neurorehabilitation report to be largely unreliable because of the lack of symptom validity testing, Plaintiff's mostly normal performance on the cognitive evaluations, the inconsistencies between the two reports, and the apparent mismatch between the abilities tested by the hand test and the requirements of Plaintiff's occupation. The opinion also noted that Plaintiff's counsel had requested copies of any internal medical reviews that Unum conducted prior to its appeal decision and stated that that request was denied, as UNUM was not

obligated to provide those reviews until after the appeal process was complete. (Appeal Decision, FU-CL-LTD-004283-4289 – SEALED).

In July of 2010, Plaintiff and Defendants participated in an unsuccessful mediation session with the Honorable John A. McAuliffe. Shortly thereafter, Plaintiff sent Unum a letter alleging that Ms. Garlington had improperly administered the FCE. Her main allegations were as follows: (1) that Ms. Garlington insisted that Plaintiff attempt to lift a wooden box over her head even after Plaintiff said several times that she couldn't; (2) that Ms. Garlington "smiled, as if she were pleased with [Plaintiff's] pain" when Plaintiff finally dropped the box on her own face; (3) that Ms. Garlington stopped part-way through the exam to watch the news for about half an hour; and (4) that Ms. Garlington chose an inaccurate job description that did not reflect the physical demands of Plaintiff's real occupation. (Plaintiff's Letter Re: FCE, FU-CL-LTD-004427-44300). After receiving a copy of the letter from Unum, Ms. Garlington responded with a letter of her own, denying the allegations. (Garlington Response to Plaintiff, FU-CL-LTD-004648-4649 – SEALED).

Defendants state that Unum considered Plaintiff's letter even though the appeal was already finished, but that, after reading Ms. Garlington's response, its decision remained unchanged.

On October 26, 2010, Plaintiff filed the instant suit in this Court. Discovery has now been completed and both sides have moved for summary judgment.

## II.    LEGAL STANDARD

**Summary Judgment: Fed. R. Civ. P. 56:** A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a party carries this burden, then the court

will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. FED. R. CIV. P. 56(e)(2). To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. FED. R. CIV. P. 56(c)(1)(A). The court will assess the merits of the motion, and any responses, viewing all facts and reasonable inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## III.   ANALYSIS

This case presents two issues for the Court's review: (1) whether Unum denied Plaintiff a "full and fair review" of its initial decision to terminate her long-term disability benefits; and (2) whether Unum's ultimate decision to terminate her benefits constituted an abuse of discretion.

### A.     Full and Fair Review

ERISA requires plan administrators to provide participants with a "full and fair review" of any adverse benefits determination.   29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(f)-(g). Plaintiff claims that Unum denied her such a review because it refused to provide her with copies of the medical and clinical reviews of her file that its physicians conducted in response to her appeal. On that basis, she requests that the Court impose administrative sanctions on Unum pursuant to 29 C.F.R. § 2560.503-1(g). The Court must address this issue first because, if the Court determines that Plaintiff is correct, then the proper course would be to remand the case to Unum. *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993). As explained below, however, the Court finds that Unum's review procedures were adequate.

Plaintiff argues that Unum denied her a "full and fair review" because: (1) it allegedly put forward new reasons on appeal for terminating her benefits, to which she had no opportunity to

respond; and (2) it relied on new evidence, in the form of medical and clinical reviews of her file, which it refused to disclose during the appeals process. The Court finds both of these arguments to be without merit. The first argument takes an incorrect view of the facts. The chronological account of the evidence produced by both sides in this case, as set out in the "Background" section of this memorandum, shows quite clearly that Unum's proffered reason for terminating Plaintiff's benefits was the same at every stage, *i.e.*, that she had failed to provide it with evidence that she continued to be restricted from performing the duties of her regular occupation. The only new material in Unum's decision on appeal consisted of reviews by its physicians of new evidence that Plaintiff herself submitted in support of her appeal. Plaintiff's second argument, that Unum was obligated to give her access to these reviews and an opportunity to rebut them before it made its final decision, takes an incorrect view of the law. This Court has adopted the position of the Tenth Circuit, set out in *Metzger v. UNUM Life Ins. Co. of America*, 476 F.3d 1161 (10th Cir. 2007), that an insurer does not have to provide a claimant with medical opinion reports generated during the claims review process until a final decision is issued. *See Skipp v. Hartford Life Ins. Co.*, Civil No. CCB-06-2199, 2008 WL 346107 at *10-11 (D. Md. Feb. 6, 2008); *Savoy v. Federal Exp. Corp. Long Term Disability Plan*, Civil Action No. DKC 09-1254 at *5 (D. Md. July 30, 2010). Therefore, Unum was under no obligation to supply Plaintiff or her counsel with the medical reviews it conducted during the appeal until after it issued a final decision.

Accordingly, neither Unum's reliance on internal reviews of Plaintiff's medical file, including the evidence she submitted on appeal, nor its refusal to supply Plaintiff or her counsel with those reviews during the appeal process deprived Plaintiff of a "full and fair review." Therefore, Defendants' motion for summary judgment will be GRANTED IN PART, and

Plaintiff's motion DENIED IN PART, with respect to Plaintiff's demand for statutory penalties under 29 C.F.R. § 2560.503-1(g).

### B.     Benefits

The real thrust of Plaintiff's claim, however, is that she is entitled to continued long-term disability benefits under the Plan and that Unum wrongly terminated those benefits.  Although Plaintiff raises numerous issues in her pleadings, including multiple irrelevant accusations regarding Unum's business practices and financial status, the Court finds that there is one issue that is dispositive.  Defendants stated that issue quite correctly when they wrote that "[t]he essence of [Plaintiff's] complaint[] was, at all times, pain and its effect upon the travel and driving requirements of her occupation."  (Def.'s Reply/Resp. at 13, ECF No. 53).  Such is the Court's assessment as well.  As further explained below, although the Court finds that Unum's decision was reasonable in most respects, it nevertheless finds that Unum abused its discretion when it determined that Plaintiff was capable of performing the driving requirements of her regular occupation.

### 1.     Standard of Review

Where, as here, an ERISA plan vests the plan administrator with discretionary authority to interpret plan terms and make eligibility determinations, a court may review the administrator's decision only for abuse of discretion.  *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629-30 (4th Cir. 2010).  Under that standard, the reviewing court will not disturb the administrator's decision so long as it is reasonable, "even if [the court] would have come to a contrary conclusion independently."  *Id*. at 630.  A decision is reasonable if it is the product of a "deliberate, principled reasoning process" and is "supported by substantial evidence."  *Id*. (citing *Guthrie v. Nat'l Rural Elec. Coop. Assoc. Long Term Disability Plan*, 509 F.3d 644, 651 (4th

Cir. 2007); *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)).  Substantial evidence is that "which a reasoning mind would accept as sufficient to support a particular conclusion," and "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984).[3]

Furthermore, a plan administrator's conflict of interest is a factor which courts must consider in determining the reasonableness of the administrator's decisions. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008).  How much weight should be accorded to such conflict, however, depends on the extent to which the record shows that the conflict actually influenced the particular decision at issue.  Although the parties here argue at length regarding how much weight, if any, should be given to Unum's admitted conflict of interest, the Court finds the issue to be moot because, even giving the conflict no weight at all, it still finds that Unum abused its discretion.  The Court therefore will not address the parties' arguments on this issue.

### 2.    Vocational Assessment

The Plan defines disability, in pertinent part, as being "limited from performing the material and substantial duties of your regular occupation due to your sickness or injury." (Policy, FU-CL-LTD-000073).  In order to determine whether a claimant is entitled to benefits,

---

[3] In *Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), the Fourth Circuit identified eight nonexclusive factors that courts should consider in reviewing the reasonableness of an administrator's decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342-43.

then, Unum must first determine what the claimant's "regular occupation" is and what the "material and substantial duties" of that occupation are.  Plaintiff argues at length that Unum failed to properly assess the demands of her occupation.  Again, however, the point is moot because both sides agree that Plaintiff's regular occupation required her at times to drive up to six or eight hours a day.  Since this point proves to be dispositive, any remaining disputes about other aspects of Unum's occupational assessment are immaterial.

### 3.     Plaintiff's Burden of Proof

As is typical of ERISA plans, the Plan in this case requires Plaintiff to provide Unum with evidence of her continuing disability in order to qualify for continued benefits.  (Policy at 7, FU-CL-LTD-00079) ("***WHEN WILL PAYMENTS STOP?*** … - the date you fail to submit proof of continuing disability"); *See Brodish v. Federal Express Corp*., 384 F.Supp.2d 827, 835 (D. Md. 2005) ("in all or most plans, the burden of proving … disability is on the employee.").  It is Defendants' contention that Unum's decision to terminate Plaintiff's benefits was reasonable because, as of May 14, 2009, Plaintiff failed to carry her burden of demonstrating continued disability.  The Court does not agree.

The Fourth Circuit has previously implied that a claimant's initial burden of proof under an ERISA plan is relatively light.  That is, it can be met simply by providing competent evidence that the claimant suffers from a serious medical condition which prevents her from working at her occupation.  *See Smith v. Metropolitan Life Ins. Co.*, 274 F.App'x. 251, 256 (4th Cir. 2008) (unpublished) (plaintiff carried initial burden of proof by submitting evidence of a severe medical condition, his own statement that the condition prevented him from working, and the statements of his treating physicians that he was unable to return to work).  Importantly, in this respect, a claimant's subjective assessment of her own symptoms, including pain, "is relevant

and cannot be totally disregarded by the insurer." *Id.* (citing *Donovan v. Eaton Corp. Long Term Disability Plan*, 462 F.3d 321, 327 (4th Cir. 2006)).   The administrator, of course, is not obligated to take the claimant's evidence at face value, and it may ultimately reject the evidence altogether and find that the claimant is not disabled.   But, to do so, it must carry its own burden by pointing to substantial evidence that refutes the claimant's claim of disability.

The Court easily finds that Plaintiff met her initial burden of providing Unum with competent proof of her disability.   First, the record is replete with medical evidence that Plaintiff suffers from degenerative disc disease, disc herniation and bulging, osteopenia of the lumbar spine, radiculopathy, and chronic pain.   Second, Plaintiff herself has consistently maintained that her pain prevents her from driving for long periods of time, as she was required to do in her regular occupation.   Third, Plaintiff's treating physical therapist, Chinh Le, opined that Plaintiff would be unable to return to work full time without experiencing extreme pain and, in particular, the her pain prevented her from driving for long periods of time.   Finally, and most significantly, while Plaintiff's other treating physicians and Unum's medical reviewers largely concurred that Plaintiff was capable of full time work in the light physical demand category, several of them also agreed that she was limited in the amount of driving she could do during a work day.   Dr. Hinkes noted vaguely that Plaintiff's driving would have to be "limited," while Dr. Hughes stated more specifically that she should not drive more than an hour at a time.   Unum's own on-site physician, Dr. Hine, agreed, opining that Plaintiff could "realistically" be expected to drive for 30 to 60 minutes at a time and that Plaintiff would likely report significant symptoms after driving for even two hours continuously.

The Court finds that this evidence was sufficient to meet Plaintiff's initial burden of establishing that she was disabled from performing the driving requirements of her regular occupation.

### 4.      Unum's Evidence

Since Plaintiff met her initial burden of proof, Unum was required to identify substantial contrary evidence to justify terminating her benefits.  Even giving Unum's decision all of the deference that is due to it, the Court simply cannot find any such evidence in the record.

Defendants identify the bases of Unum's initial termination decision as: "(1) four medical reviews; (2) six vocational reviews; (3) an interview. . . ; (4) two clinical reviews; (5) three days of surveillance and; (6) a Functional Capacity Evaluation."   Unum's decision on appeal was based in part on the same evidence and, in addition, on: (1) three medical reviews by a physician and nurse; (2) two neuropsychologic reviews; and (3) a follow up with the physical therapist who conducted the FCE."   (Def.s' Mem. 3, ECF No. 51).   The Court has already detailed this evidence in the "Background" section of this memorandum but will review it again briefly with specific reference to the issue of Plaintiff's driving restrictions.

First, much of the evidence Defendants cite is obviously not relevant to Plaintiff's driving capacity.   Specifically, the field interview, the neuropsychologic reviews, and the clinical reviews by Dr. Burgos with regard to Plaintiff's mental health treatment clearly have no bearing on the issue, and there is thus no need for the Court to address them.

Second, the "six vocational reviews" that Defendants trumpet do nothing to support their position.  In fact, they confirm that Plaintiff's occupation requires her to drive up to eight hours in a single day.

Third, many of the medical reviews Defendants cite actually support Plaintiff's claim that she cannot do the amount of driving required by her regular occupation, and the reviews that suggest the contrary are insubstantial.  Specifically, out of the initial four medical reviews, three were by Dr. Hine, whose ultimate conclusion was that Plaintiff could drive at most for an hour at a time, and no more than four hours total in a work day.  The fourth review, by Dr. Leverett, described Plaintiff's occupation as involving driving only up to "66% of the day."  Sixty-six percent of an eight hour work day is approximately 5 hours and 17 minutes, well short of the six to eight hours Plaintiff would have to drive when traveling to Virginia or Pennsylvania.  Dr. Leverett did later amend his report to state that no further "medical steps" were necessary because the FCE assessed Plaintiff as capable of returning to her occupation full-time, which might imply that he accepted Ms. Garlington's opinion that Plaintiff could drive up to eight hours a day.  He does not appear, however, to have formed any medical opinion of his own on that issue, nor does he explain his basis for adopting  Ms. Garlington's opinion, if that is indeed what he did.  Further, none of the medical reviews on appeal say anything about Plaintiff's driving capacity.  Nurse Murphy's review did not address Plaintiff's functional capacity at all, and offered only the conclusory opinion that the record did not support Plaintiff's reported pain levels.  Dr. Krouskop's first review explores Plaintiff's medical history in detail, noting many inconsistencies with respect to her pain levels and functional restrictions, and concludes that "Considering the claimant's conditions in aggregate, no additional restriction are supported."  It does not address Plaintiff's ability to drive long distances or acknowledge that this is part of her occupation.  Presumably, Unum inferred that Dr. Krouskop's opinion that "no additional restrictions are supported" included driving, but the Court cannot accept such an inference as substantial evidence.  Furthermore, Dr. Krouskop's review contains an inconsistency of its own

in that, while he opines that Plaintiff can return to work full time, he also writes in the "Conclusion" section of his report that "Wong's and Mr. Le's restrictions are not supported … Dr. Hughes [sic] restrictions *are* supported." (Krouskop Review I, FU-CL-LTD-002976 – SEALED) (emphasis added).   But, according to Dr. Hine's review, Dr. Hughes' restrictions included limiting Plaintiff's driving to one hour at a time.  (Hine Review I, FU-CL-LTD-000693 – SEALED).  Finally, Dr. Krouskop's second review dealt only with Plaintiff's alleged cognitive impairments, which are clearly not relevant.

Fourth, the FCE provides only insubstantial evidence that Plaintiff can drive for the required lengths of time.  In fact, the initial evaluation did not purport to assess Plaintiff's driving capacity at all.  It was only when Unum requested an opinion from Ms. Garlington as to whether Plaintiff could work more than eight hours a day that she addressed the issue of driving time, stating that Plaintiff's driving should be limited to eight hours per day.  There does not appear to be any explanation in her report, however, of how she reached the conclusion that Plaintiff could drive for eight hours per day.  It is certainly plausible that she might have formed this opinion based on the FCE results with respect to measures of Plaintiff 's range of motion and the length of time that she can sit; but, conjecture about how an otherwise unsupported opinion may have been formed is not substantial evidence.

Finally, the record provides no support for Defendants' contention that Unum's video surveillance of Plaintiff shows her "driving for prolonged periods of time."   The video footage itself is not in evidence, but the surveillance notes of the private investigator reveal that he in fact only observed Plaintiff driving for very short periods of time.  Those notes contain the following entries with respect to Plaintiff's driving: (1) on Tuesday, March 31, 2009, at 10:54 A.M., the investigator saw a woman whom he believed to be Plaintiff depart from her residence in a silver

Volvo; at 11:09, the investigator lost sight of Plaintiff and was unable to find her again; (2) on Wednesday, March 1, 2009, at 8:08 A.M., the investigator saw Plaintiff arrive in her silver Volvo at her "appointment."[4]  At 12:45 P.M., Plaintiff drove away; the investigator followed her while she drove back to her residence, where she arrived at 1:14 P.M.; (3) on Thursday, March 2, 2009, at 12:18 P.M., the investigator observed Plaintiff drive away from her residence in the silver Volvo; at 12:31, he observed Plaintiff enter the Wayne Avenue Parking Garage; the investigator began to canvass the parking lot for Plaintiff's car, which he found unattended at 1:03 P.M.; at 1:27 P.M. the investigator saw Plaintiff drive out of the parking garage, but he was unable to follow her because, unbeknownst to him, he had to pay a parking fee to an automated cashier before he could exit the garage, by which time Plaintiff was out of sight; the investigator canvassed the surrounding area for Plaintiff but could not find her; he performed a spot check at Plaintiff's residence at 1:46 and her car was not there; after further canvassing, the investigator returned to the residence at 2:01, and the car was still not there; at 2:34, the investigator left.

Thus, the investigator observed Plaintiff driving for 15 minutes on the first day of surveillance, 29 minutes on the second day, and 13 minutes on the third day.  Even by the most deferential standard, the Court cannot seriously entertain Defendants' contention that these were "prolonged periods of time."  Furthermore, while Defendants state that Plaintiff did not display "any outward signs of pain or discomfort" during the other activities the investigator observed,[5] this characterization is conspicuously absent from their reference to the footage of her driving.

For these reasons, the Court concludes that there is no substantial evidence in the record that Plaintiff is able to drive for the six to eight hours a day that her regular occupation sometimes requires.  Unum therefore abused its discretion in terminating her long-term disability

---

[4] Presumably for her functional capacity evaluation.
[5] The Court does not know what the basis for this assertion is, as it is certainly nowhere in the investigator's report.

benefits.   Defendants' motion for summary judgment will therefore be DENIED IN PART, and

Plaintiff's motion for summary judgment GRANTED IN PART, with respect to Plaintiff's claim

of entitlement to long-term disability benefits under the Plan.

## IV.      CONCLUSION

Accordingly, an order shall issue GRANTING IN PART and DENYING IN PART

Defendants' Motion for Summary Judgment (ECF No. 51) and GRANTING IN PART and

DENYING IN PART Plaintiff's Motion for Summary Judgment (ECF No. 52) as set out in this

memorandum.



Dated this 4th day of April, 2012

BY THE COURT:


_____/s/_____
James K. Bredar
United States District Judge